**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

CAROL TIMS, individually, and on
behalf of all others similarly situated,

       Plaintiff,

    v.

LGE COMMUNITY CREDIT
UNION,

       Defendant.

Case No.  1:15-cv-04279-CAP

**DEFENDANT LGE COMMUNITY CREDIT UNION'S BRIEF IN**
**SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S FIRST**
**AMENDED COMPLAINT**

Defendant, LGE Community Credit Union ("LGE" or "Defendant"), by and through its undersigned counsel, files this Motion to Dismiss Plaintiff's First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and Local Rule 7.1 (A) of the Northern District of Georgia.  For the reasons set forth below, LGE respectfully requests that this Court grant this Motion in its entirety and dismiss Plaintiff's First Amended Complaint without leave to amend.

## I.   PRELIMINARY STATEMENT

This case is one of many filed by Plaintiff's counsel against credit unions across the country.  While the facts in each of the cases are different based on, among other things, the disclosures and membership agreements used by the various defendants, the theory of liability is essentially the same:  The defendants improperly charge overdraft fees by using the "available" balance and not the

04030915-

"ledger" or "actual" balance of a member's checking account.  The Plaintiff in this case, like all the others who have filed similar claims, does not (and cannot) challenge LGE's right to charge fees based on her available balance.  Rather, she claims the charges are improper because her Membership and Account Agreement and other documents given to her by LGE supposedly say she will be charged fees only if there is not money in her actual or ledger balance to cover a transaction.

Plaintiff's Membership Agreement says no such thing, and there is no document stating that overdrafts are based on a member's actual balance.  Plaintiff has created this fictional obligation based on her idiosyncratic interpretation of the Membership Agreement.  But the language of the Membership Agreement is clear; it states that an overdraft occurs when there are "insufficient" funds to pay a particular transaction.  It is axiomatic that funds must be available to use for them to be "sufficient" to make a payment.

Even if the language of the Membership Agreement is not clear (and it is), Plaintiff's interpretation is contrary to Georgia's cannons of construction.  A contract must be read as a whole and an interpretation of one provision that will act to eviscerate another provision should be rejected.  Here, a significant part of the Membership Agreement expressly and clearly defines when funds are available to make payments.  These provisions are consistent with and required by Regulation CC, which governs when deposited funds must be made available to consumers.  Under Plaintiff's interpretation of the agreement, the Funds Availability Policy would be meaningless because a member's actual or ledger balance does not account for deposit holds.

Accordingly, Plaintiff's first through fourth claims—for breach of contract, breach of the covenant of good faith, unjust enrichment and money had and

received—all of which are based on alleged breaches of the Membership Agreement—should be dismissed without leave to amend.

Plaintiff's fifth claim, for purported violations of Regulation E, is likewise defective.   According to Plaintiff, assessing overdraft fees for ATM and non-recurring debit-card transactions based on her available balance is a violation of Regulation E because it is contrary to the terms of a mandatory federal form.  This opt-in consent form states that an overdraft occurs when there is not "enough" money to pay for a transaction.  "Enough" is a synonym of "sufficient."  Like the Membership Agreement, the form cannot be read to mean something that would void provisions governing when deposited funds are available.   Plaintiff's interpretation of the consent form is also contrary to Regulation E (where the model form is located), which unequivocally authorizes financial institutions to assess overdraft fees using a member's available account balance.  This fact was considered when the consent form was created.   The regulators, knowing that available balance is used to assess overdrafts, polled consumers when determining what language should be used in the consent form and eventually settled on the phrase "enough money."   Thus, charging overdraft fees based on a member's available balance is not a violation of Regulation E and the fifth claim should be dismissed as well.[1]

---

[1] The second claim for unjust enrichment should also be dismissed because it is not a claim for relief; it is at most a way to plead consideration for an otherwise unenforceable contract.

04030915-    3

## II.   BACKGROUND

### A.   The Parties

Defendant LGE is a non-profit, state charted, Georgia-based credit union that provides banking and other financial services to approximately 100,000 members.   (First Amended Complaint (FAC), ¶ 9.)   Like most financial institutions, LGE offers its members the option of "opting in" to overdraft protection for ATM and non-recurring debit card transactions. (*Id.*, ¶¶ 14-16.)

Plaintiff Carol Tims is a member of LGE.   (*Id.*, ¶ 2.)   She allegedly was assessed improper overdraft fees on June 29, 2013 and September 17, 2013.   (*Id.*, ¶ 26.)

### B.   Plaintiff's Allegations

Plaintiff originally filed this putative class action on December 9, 2015. After LGE filed a motion to dismiss, Plaintiff filed her First Amended Complaint on April 25, 2016.

She now alleges five claims for breach of contract, breach of the covenant of good faith and fair dealing (essentially the same as breach of contract), unjust enrichment, money had and received, and violation of the Electronic Fund Transfer Act.   All of Plaintiff's claims are based on LGE's practice of calculating overdraft fees based on a member's "available" account balance, rather than her "ledger" or "actual" account balance.   (*Id.*, ¶¶ 19, 20.)   She claims that this practice is "(1) contrary to the express terms of LGE's contracts with members; (2) contrary to how LGE represents its overdraft program to its members; and (3) contrary to what members expect when assessed overdraft fees." (*Id.*, ¶ 16.)

In support of these allegations, Plaintiff cherry-picks portions of the LGE Membership Agreement which states that a fee will be assessed when "an item is

presented without sufficient funds in your account to pay it." (*Id.*, Ex. 1 at p. 2.) She also cites to the federally mandated form used to opt into courtesy pay for ATM and non-recurring debt card transactions, which defines an overdraft as "not enough money in the account to cover a transaction." (*Id.*, ¶ 17, Ex. 2.) According to Plaintiff, these provisions mean that LGE will only charge overdraft fees where the funds in the member's "ledger" or "actual" balance cannot cover a particular transaction.

The difference between actual and available balance, and how each is calculated and used, is critical. While Plaintiff characterizes available balance as an "artificial internal calculation" (*id.*, ¶ 19), she concedes that it is calculated by taking the actual balance and subtracting from it that portion of any deposits on hold and payments that have been authorized by LGE at Plaintiff's request but have not yet posted. (*Id.*, ¶20.) In other words, if Plaintiff has a $100 actual balance but uses her debit card to buy dinner for $40 and LGE put a pre-authorization hold on her account for that amount (at the request of the merchant), then her available balance (the money she has left to use) is $60.00. Or, if she deposits an out-of-the-state check in the amount of $5,000 and a hold is placed on all but $200, then she will have only $200 available to use. In this example, her actual balance is $5,000, even though the check may never clear.

Based on these allegations, Plaintiff purports to represent two potential classes:

1.     The "Positive Balance Class" is defined as:  "All US residents who have or have had accounts with LGECCU who incurred overdraft fees for debit transactions when the ledger balance in the checking account was sufficient to cover the transactions in the six (6) years preceding the filing of this Complaint."

(*Id.*, ¶ 31.) The first four claims—for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment and money had and received—apply to the Positive Balance class.

      2.    The Regulation E Class is defined as "All US residents who have or have had accounts with LGECCU who incurred overdraft fee(s) for ATM and non-recurring debit card transactions since August 15, 2010 who were opted-in [sic] to the overdraft program for debit card transactions through the use of the Opt-In Agreement that defined an overdraft as when the customer does not have enough money in their account to cover a transaction, but the credit union pays it anyway." (*Id.*) The fifth claim for violation of the Electronic Fund Transfer Act applies to the Regulation E Class.

### C.    LGE's Overdraft Protection Policy And Opt-In Consent Form

      Under Regulation E, a member must opt into overdraft protection for ATM and non-recurring (one-time) debit card transactions. (*Id.*, ¶¶ 14, 15.) Like virtually all banks and credit unions, LGE presents its members with a Consent Form for Overdraft Services (commonly referred to as and opt-in form). A copy of the opt-in form is attached to the First Amended Complaint as Exhibit 2.

      The opt-in form used by LGE is substantially the same as the model in Regulation E. It briefly describes LGE's overdraft services, including the types of transactions for which an overdraft fee may be imposed, the dollar amount of overdraft fees charged by LGE, the maximum number of overdraft fees that may be charged, and the consumer's right to opt into, or opt out of, LGE's payment of overdrafts. (*Id.*, Ex. 2.)

**D.      Relevant Provisions Of LGE's Membership Agreement**

LGE's Membership Agreement is attached to the Complaint as Exhibit 1. The section governing "Payment Order of Your Transactions" provides in part as follows:

> Our payment policy may cause your larger, and perhaps more important, items to not be paid first (such as your rent or mortgage payment) but may reduce the amount of Overdraft or NSF fees you have to pay if funds are not *available* to pay all of the items.  If an item is presented *without sufficient funds* in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item (NSF).  The amounts of the overdraft and NSF fees are disclosed within our Fee Schedule.  *We encourage you to make careful records and practice good account management.  This will help you to avoid writing checks or drafts without sufficient funds and incurring the resulting fees.*

(*Id.,* Ex. 1 at p. 2.)  (emphases added).

The section of the Membership Agreement relating to Visa Debit Card Transactions states as follows:

> We may, at our discretion, return any check or other item drawn on your account to ensure there are *sufficient* funds to cover a card transaction.  If there are *insufficient funds in your account* to cover a transaction…an advance may be made under the terms of that agreement to cover the transaction if a *sufficient* amount is within your available credit limit. We are not obligated to pay out any funds if the balance in your account is not *sufficient* and there is no other account with *sufficient* funds or an overdraft line of credit.

(*Id.,* at p. 5) (emphases added.)

In addition, the Courtesy Pay Section pronounces, among other things, that LGE "is not obligated to pay any item presented for payment if a checking account does not contain *sufficient* collected funds."  (*Id.,* Ex. 1 at p. 10) (emphasis added.)

The Membership Agreement also describes in detail when deposited funds are "available" for use. "Depending on the type of check that you deposit, funds may not be available until the second business day after the day of your deposit" and the "first $200 of your deposit" is not made available until "the first business day *after* the day of your deposit." (*Id.*, at p. 7) (emphasis added). Similarly, "ATM deposits (cash or checks) of $5,000 or less made at a LGE Community Credit Union ATM will be available . . . on the 2nd business day after the day we receive your deposit," "[d]eposits in excess of $5,000 are subject to be held an additional 4 business days," and "ATM deposits (cash or checks) made at a non LGE Community Credit Union ATM will be available...on the 5[th] business day after the day we receive your deposit." (*Id.*) Deposits in excess of $5,000 are subject to be held an additional four business days. (*Id.*)

As explained next, LGE did not breach any agreements or violate Regulation E, nor is it liable to Plaintiff under any other theory alleged in the FAC.

## III.  ARGUMENT

A court should dismiss a complaint under Rule 12(b)(6) if it does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Cox v. Bank of Am. Corp.*, No. 1:15–cv–172, 2015 WL 5174013, at *3 (N.D. Ga. Sept. 3, 2015) (quoting *Ashcroft v Iqbal*, 556 U.S. 662, 678 (2009). "This requires more than the 'mere possibility of misconduct'." *Cox*, 2015 WL 5174013, at *3. The "court must accept the facts pleaded in the complaint as true[.]" *In re Atlas Roofing Corp. Chalet Shingle Products Liab. Litig.*, 22 F. Supp. 3d 1322, 1326 (N.D. Ga. 2014).

But "a plaintiff's obligation to provide the 'grounds' of his entitlement to relief requires more than labels and conclusions." *Twombly*, 550 U.S. at 555.

Because Plaintiff attached the Membership Agreement and opt-in form as exhibits to the FAC, the Court may treat these documents as part of the -pleading. *See Arango v. U.S. Dep't of the Treasury*, 115 F.3d 922, 923 n. 1 (11th Cir. 1997); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

As explained below, the FAC should be dismissed because it does not contain facts sufficient to state any of the purported claims alleged against LGE.

### A.   Plaintiff Has Not Alleged A Breach Of Contract Or Breach Of The Covenant Of Good Faith And Fair Dealing Because The Only Reasonable Interpretation Of The Membership Agreement Is That Overdraft Fees Will Be Based On Available Funds.

Georgia law applies to LGE's Membership Agreement.  (FAC, Ex. 1 at 1.) The "cardinal rule of [contract] construction is to ascertain the intention of the parties." *Georgia R.R. Bank & Trust v. Fed. Deposit Ins. Corp.*, 758 F.2d 1548, 1551 (11th Cir. 1985).  Applying this cardinal rule requires three steps.  First, if the language of a contract is "clear, unambiguous, and capable of only one reasonable interpretation, a court is required to enforce the contract according to its clear terms." *Kwok v. Delta Air Lines, Inc.*, 578 Fed. Appx. 898, 900 (11th Cir. 2014) (citing *CareAmerica, Inc. v. S. Care Corp.*, 494 S.E.2d 720, 722 (Ga. App. 1997)). Second, if the contract is ambiguous, the court must apply the rules of contract construction to resolve the ambiguity.  *Id.*  Finally, if the ambiguity remains after applying the rules of construction, the meaning of the ambiguous language and what the parties intended is a jury question.  *Id.*

Here, Plaintiff alleges that the term "sufficient funds" means the amount in a member's ledger or actual balance without considering how much of that amount a member has *available* for transactions (*i.e.*, without considering "holds" on deposits or authorized transactions).   As explained next, sufficient funds is not ambiguous and even if it were, reading the contract as a whole, the only reasonable interpretation is that sufficient funds means the amount of money a member has available to use.

### i.     The Term Sufficient Funds Means Available Funds To Cover A Particular Transaction.

In determining whether an ambiguity exists, a court looks at the "plain text" and the "natural" reading of that text.  *Kwok v. Delta Air Lines, Inc.*, 994 F. Supp. 2d 1290, 1293 (N.D. Ga. 2014), *aff'd*, 578 Fed. Appx. 898.  And it is not enough that "the contractual wording is not so specific as to foreclose [a] Plaintiff's reading"; that reading has to be a natural one based on the text of the agreement. *Id.*  Here, the only natural reading of the Membership Agreement is that sufficient funds means available funds that could cover a proposed transaction.

The word "sufficient" means a quantity to meet the needs of a situation.  *See* Webster's Third New International Dictionary, Unabridged, s.v. "sufficient," accessed March 23, 2016, http://unabridged.merriam-webster.com.  As common understanding would suggest, funds that are not available to use are not capable of meeting the needs of a particular transaction.  And LGE's Membership Agreement is clear that only certain funds will be "available" for a member to use; or in other words, to meet the needs of a transaction.   In particular, the Membership Agreement states clearly that only when funds are "available" can a member "withdraw the funds" or can they be "use[d] . . . to pay checks" that a member has

written.  (Compl., Ex. 1 at p. 8.)  And there are a number of scenarios in which LGE states that funds will not be "available" to a member immediately.  (*Id.*)

Accordingly, the only natural reading of the term "sufficient funds" means the funds a member has available to cover a certain transaction.  Indeed, if funds are not available to use, how could they possibly meet the needs of a particular transaction?  This is how a majority of consumers understand overdrafts to work.  When the Federal Reserve was testing consumer expectations regarding how overdraft fees would work for ATM and non-recurring debit card transactions, it found that the majority of consumers understood they would be charged a fee if they sought to withdraw more money than they had available.  *See* Review and Testing of Overdraft Notices (Dec. 8, 2008), at p. 7, *available at* http://www.federalreserve.gov/newsevents/press/bcreg/bcreg20081218a6.pdf  (last accessed March 25, 2016) ("Federal Reserve Testing").

Finally and most tellingly, LGE explains exactly what sufficient funds means in its Membership Agreement.  As explained above, it says an overdraft occurs when there are not sufficient funds in a member's account to cover a transaction.  The Membership Agreement explains further, what common parlance dictates, that overdraft or NSF fees occur "if funds are not available to pay all of the items." (FAC, Ex. 1 at p. 3.)  Accordingly, under the plain and natural reading of the Membership Agreement, sufficient funds means available money to cover a transaction.

In support of her idiosyncratic interpretation, Plaintiff will likely rely on *In re TD Bank, N.A.*, No. 6:15-MN-2613, 2015 WL 8493979 (D.S.C. Dec. 10, 2015), an opinion issued out of the District of South Carolina.  Not only is *TD Bank's* holding not binding, but it is factually inapposite because the account agreement in

TD Bank used the *contradicting* terms "negative balance" and "negative available balance" interchangeably, causing confusion. According to the *TD Bank* court, this left "outstanding factual questions." *Id.*, at *19.

Here, unlike TD Bank, LGE used *consistent* terms.[2] As discussed above, the Membership Agreement provides that LGE may charge an overdraft fee where there are not sufficient funds (i.e., where "the funds are not *available* to pay all of the items.") (FAC, Ex. 1 at p. 2.) (emphasis added). The Membership Agreement goes on to describe in detail when deposited funds are not "available" for use. (*Supra*, at pp. 6-7.) Thus, unlike the language at issue in *TD Bank*, there are no contradicting terms suggesting that LGE may use members' "actual" account balances to make payments and assess overdraft fees. Accordingly, *TD Bank* is of no help to Plaintiff here.

*Kwok v. Delta Air Lines* is, however, instructive. In that case, the plaintiff tried to stretch the meaning of "the distance from origin to final destination" to mean the distance of the actual route flown as opposed to the straight-line distance between the two airports. 994 F. Supp. 2d at 1293. The court rejected the plaintiff's interpretation because it was an unnatural one. *Id.* at 1293 n. 2 ("Common parlance supports the Defendant's reading as well. If one were to ask for the 'distance' from one end of a football field to the other, the natural response would be the direct end-to-end length."). Here, common parlance confirms that LGE's interpretation is the only natural one. If one were to ask whether

---

[2]    And maybe more importantly, the district court never engaged South Carolina's cannons of construction to resolve any ambiguity or potential inconsistency. As explained below, even if the Court finds LGE's use of the term "sufficient" to be unclear, Georgia's cannons of construction confirm LGE's interpretation of the contract. (*Infra* at 12-14.)

unavailable funds were "sufficient funds" to cover a transaction, *every reasonable person* would say no.

LGE respectfully requests that the Court say "no" as well and find that Plaintiff's interpretation of the contract is contrary to the plain text, and that LGE did not breach the Membership Agreement or the covenant of good faith implied in that agreement by considering "available" funds for purposes of assessing overdrafts.

### ii.     Even If The Term "Sufficient Funds" Were Ambiguous, Georgia's Cannons Of Construction Confirm LGE's Interpretation.

Two of Georgia's cannons of construction confirm LGE's interpretation. First, and most importantly, a "contract must be construed so as to reconcile its different provisions and to reject a construction that leads to a contradiction." *Anderson v. Anderson*, 552 S.E. 2d 801, 804 (Ga. 2001).   In other words, "contracts must be construed in their entirety in a manner that permits all of the terms contained therein to be consistent with one another." *Colonial Props. Realty Ltd. v. Lowder Constr. Co.*, 567 S.E. 2d 389, 391 (Ga. App. 2002).

Here, interpreting "sufficient funds" to mean the money *available* to cover a transaction is the only interpretation that gives effect to the entire contract without any contradictions.  Plaintiff's interpretation, by contrast, would eviscerate and nullify LGE's "funds availability policy."  Plaintiff claims that "sufficient funds" means all deposited funds without considering any holds.  (FAC, ¶¶ 20-22.)  The term "sufficient funds" controls whether a member overdrafts her account or incurs a non-sufficient funds fee for a transaction that is declined.  (*Supra* at pp. 6-7.)

Plaintiff's interpretation, therefore, would mean that a member can use all of her deposited funds for a particular transaction regardless of any holds.

By contrast, LGE's funds availability policy *specifically* determines how much of the deposited funds will be made available for a member to use for a particular transaction. (FAC, Ex. 1 at p. 8) (noting that only "available" funds may be withdrawn or used to pay checks a member has written).[3] If, as Plaintiff claims, LGE may not consider the funds on hold when authorizing or paying a transaction, LGE's funds availability policy is rendered a nullity because the holds LGE puts on deposits will have no impact on whether a member may spend the full amount of a deposit immediately.

An example is illustrative: If a member makes a $10,000 deposit with an out-of-state check, then her available balance will be $200 and her "actual" or "ledger" balance will be $10,000 until the deposit hold is released. According to Plaintiff (and in contradiction to LGE's funds availability policy), the member may spend the full $10,000 immediately; in other words, the member would not overdraw her account and LGE could not decline a transaction if she immediately spent or tried to withdraw $1,000, $5,000 or even the full $10,000. That is how Plaintiff's interpretation nullifies a full page of the parties' Membership

---

[3] Another cannon of construction supports LGE's interpretation, as the specific funds availability provision controls over the more general "sufficient funds" provision. *See Schwartz v. Harris Waste Mgmt.*, 516 S.E.2d 371, 375 (Ga. App. 1999) ("[U]nder general rules of contract construction, a limited or specific provision will prevail over one that is more broadly inclusive."). LGE's interpretation also avoids a contradiction with its explanation that overdraft or NSF fees occur "if funds are not available to pay all of the items." (FAC, Ex. 1 at p. 2.)

Agreement.  And that is why only LGE's interpretation gives effect to each and every word of it and avoids any internal contradictions.

Second, Plaintiff's interpretation would lead to an absurd result.  *See Tudor v. Am. Emp'rs. Ins. Co.*, 173 S.E.2d 403, 405-06 (1970) ("A contract must be given a reasonable construction which will uphold and enforce the instrument, if possible, rather than a construction which would . . . lead to an absurd result."). One would only need to increase the numbers in the example above to see the absurdity of Plaintiff's interpretation.  Instead of a $10,000 deposit, imagine a $1 million deposit.  Plaintiff's interpretation would permit, and perhaps encourage, criminal activity (*i.e.*, check kiting), certainly an absurd result.[4]

Accordingly, to give meaning to the entire agreement and to avoid an absurd result, the only reasonable interpretation is that "sufficient funds" means funds *available* to cover a transaction.

### iii. Invoking The Covenant Of Good Faith And Fair Dealing Does Not Save Plaintiff's Claims From Dismissal.

First and foremost, the implied covenant of good faith and fair dealing is not independently actionable absent a breach of a specific contractual term. *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1429 (11th Cir. 1990).  Thus, the

---

[4]     Plaintiff may claim that any ambiguity should be construed against LGE. That is not the case where the provision, like this one, is not ambiguous, and even where it could be ambiguous, where "other parts of the contract clarify its meaning." *Kwok*, 994 F. Supp. 2d at 1295 ("No cannon of interpretation is absolute [and] [e]ach may be overcome by the strength of differing principles that point in other directions.") (citations and quotations omitted).  Only when a trial court cannot "resolve the conflicting interpretations by applying the rules of contract construction" should the term be strictly construed against the drafter. *See Murphy v. Ticor Title Ins. Co.*, 729 S.E.2d 21 (Ga. App. 2012).

04030915-      15

covenant modifies *existing* terms to prevent a breach of those terms "de facto when performance is maintained de jure." *Id.* In other words, Plaintiff must set forth facts showing a breach of an *actual term* of the agreement; general allegations of breach of the implied duty, like what Plaintiff has done here, are not actionable. *Id.*; FAC ¶¶ 50-57; *see Clark v. Aaron's, Inc.,* 914 F. Supp. 2d 1301, 1308 (N.D. Ga. 2012) ("[T]o state a claim for breach of the implied covenant, the plaintiff must be found to have stated a claim for breach of contract (since the implied covenant cannot be breached independently of an express contract term.")). The Court should dismiss the cause of action for this reason alone.

Second, Plaintiff could never state a breach of a contractual term based on the implied covenant because, as explained above, the contract permitted LGE to use available balance in assessing overdraft fees. *Morrell v. Wellstart Health Sys., Inc.,* 633 S.E. 2d 68 (Ga. App. 2006) is instructive. In that case, the court used the "rules of contract construction" to determine that the term "all charges" referred to a separate written summary, which permitted the company to charge a price the plaintiff disputed. *Id.* at 72-73. The court then rejected the plaintiff's attempt to use the implied covenant of good faith and fair dealing. *Id.* at 72 ("The Morrells also contend that Wellstar Health's charges for medical care violated implied covenants . . . . Although each contract to pay for medical care contained an implied covenant . . . in the *performance* of the contract, there is no independent cause of action for violation of the covenant apart from breach of an express term of the contract.") (emphasis added). In short, because the contract's use of "all charges" permitted the defendant to charge the plaintiff the disputed price, there could be no breach of the implied covenant. The same is true here. LGE did not breach the implied covenant (by following the terms of the parties' bargain)

because the rules of contract construction mean that "enough money" means funds available to use.[5]

Finally, the "implied duty cannot be inconsistent with an express term of the contract." *Higginbottom v. Thiele Kaolin Co.*, 251 Ga. 148, 149 (1983) ("In deciding whether to imply promises or duties to the terms of a contract, the introduction of an implied term into the contract of the parties ... can only be justified when the implied term is not inconsistent with some express term of the contract and where there arises from the language of the contract itself, and the circumstances under which it was entered into, an inference that it is absolutely necessary to introduce the term to effectuate the intention of the parties."). As explained above, Plaintiff's interpretation of the Membership Agreement and Opt-in Form would eviscerate the explicit Funds Availability Policy. Accordingly, the covenant cannot be used to read "ledger" balance into the parties' agreements.

*** 

In sum, "absent contract language stipulating" that LGE must use the actual or ledger balance in determining when a transaction will overdraft an account, Plaintiff has "failed to demonstrate that [LGE's] method" of assessing overdrafts— by using available funds—"violated the terms" of the Membership Agreement or any covenant of good faith implied in that agreement. *See Kwok*, 578 Fed. Appx.

---

[5]   The implied covenant protects contracting parties where one party has discretion. *Am. Mgmt. Servs. E., LLC v. Fort Benning Family Cmtys., LLC*, 774 S.E.2d 233, 246 (Ga. App. 2015) ("The duty of Good Faith and Fair Dealing requires that you examine the acts taken with discretion to determine whether they were arbitrary or egregious."); *see also Ameris Bank v. Alliance Investment & Mgmt. Co., LLC*, 739 S.E.2d 481 (Ga. App. 2013) ("[W]here the manner of performance of a contractual provision is left more or less to the discretion of one of the parties to the contract, he is bound to the exercise of good faith.")

at 902.  Accordingly, Plaintiff's first through fourth claims, all of which are based on purported breaches of the Membership Agreement, should be dismissed without leave to amend.

**B.    Plaintiff's Electronic Funds Transfer Act Claim Should Be Dismissed Because LGE has Complied With The Act And The Regulations.**

Plaintiff claims LGE violated Regulation E because the opt-in form states that LGE will charge overdrafts on ATM and non-recurring debit-card transactions based on the ledger or actual balance and LGE charges overdrafts based on the available balance.  (*Id.*, ¶¶ 19, 20, 21, 24, 25.)  But like Plaintiff's Membership Agreement, the opt-in form says no such thing.  It says an overdraft occurs when there is not *enough money* in the account to cover a transaction.  (*Id.*, Ex. 2.)

LGE's use of that language is not a violation of Regulation E for at least two reasons.  First, "enough" is a synonym of "sufficient."  *See* Webster's Third New International Dictionary, Unabridged, s.v. "enough," accessed March 23, 2016, http://unabridged.merriam-webster.com.    And,  as  described  above,  every reasonable consumer would expect that if she has no money available to use, there would not be *enough* money in her account to cover a transaction.  Accordingly, LGE's use of the model form to briefly describe its overdraft practice is accurate. Second,  LGE  used  the  Federal  Reserve's  "model  form,"  which  went  through extensive consumer testing.  Through all of that testing, the Federal Reserve expected  financial  institutions  would  use  the  "available  balance"  to  calculate overdraft fees.  Regulation E, in fact, requires financial institutions to use a form that is "substantially similar" to the model form, only allowing for certain modifications, one of which is *not* the "enough money" language.  In sum, LGE

was essentially required to use that language, which was approved by the Federal Reserve after extensive testing. Thus, LGE did not violate Regulation E.

### i. As Common Sense Would Indicate, "Enough Money" Means Money Available To Cover A Transaction.

Before a financial institution can "assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service" 12 C.F.R. § 205.17(b)(1), it must provide consumers with an opt-in form that includes, among other things, a brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed.

Plaintiff claims LGE violated that provision of the regulation because it used the Federal Reserve's Model Form, which says that an overdraft occurs if there "is not enough money in the account" to cover a transaction. 12 C.F.R. § 205.17, Appx. A-9. Plaintiff believes this language means overdrafts must be determined based on a member's ledger or actual balance as opposed to the money a member has available to use pursuant to LGE's funds availability policy. She is wrong.

"Enough" means "present or occurring in such quantity, quality, or scope as to satisfy fully the demands, wants, or needs of a situation or of a proposed use or end." *See* Webster's Third New International Dictionary, Unabridged, s.v. "enough," accessed March 23, 2016, http://unabridged.merriam-webster.com. Just like no reasonable consumer would conclude that sufficient funds includes funds that are not available to use, no reasonable consumer would expect that if he had no money available to use that he would have "as much as required" to cover a transaction. Enough money, therefore, means money available to use to cover a transaction.

Indeed, the Federal Reserve expected this when it created the "enough money" language. The regulation itself contemplates that an overdraft will occur if the member lacks funds available to use to cover a transaction. *See* 12 C.F.R. § 205.17 (A financial institution may assess "a fee or charge on a consumer's account held by the institution for paying a transaction (including a check or other item) when the consumer has *insufficient or unavailable* funds in the account.") (emphasis added); Regulation E Final Rule, 74 F.R. 59033-01 (Nov. 17, 2009) ("[U]nder network rules, financial institutions must pay authorized debit card transactions, even if at settlement intervening transactions by the consumer have reduced the consumer's *available balance* below the authorized amount of the transaction.") (emphasis added.)

The Federal Reserve tested different language in several consumer studies, hoping to find language where consumers would understand that if they tried to withdraw more funds than were available, an overdraft fee would occur. In fact, iterations of the Model Consent Form drafted during Regulation E's approval process used the term "available." *See* Federal Reserve Testing, at p. 3 ("if you try to spend or withdraw more money from your account than is *available*") (emphasis added.). The Federal Reserve ultimately chose to use the "enough money" language because it causes the least confusion amongst consumers.

Specifically, the consumer testing revealed that "[w]hen asked about a scenario in which they tried to take out more money from an ATM than was available in their account, about half of participants understood that they would be allowed to do so and that they would subsequently be charged an overdraft fee." Federal Reserve Testing, p. 7. Participants also "understood that they had been charged…[overdraft] fees because they had made a transaction for more money

than was available in their account." *Id.*, p. 15.  Accordingly, it is clear that the Federal Reserve, and the majority of the consumers it tested, understood "enough money" to mean money available to use.[6]

The plain language, supported by ample consumer testing, contradicts Plaintiff's interpretation of the opt-in form.  Her claim, that LGE failed to provide a brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge may be imposed, therefore, fails.[7] Accordingly, her claim for a violation of Regulation E should be dismissed.

### ii.     LGE Cannot Violate Regulation E By Using The Model Form The Regulation Essentially Requires.

Plaintiff does not claim, nor could she, that LGE has altered or changed the language in Regulation E's model form.  If it had, *then* LGE may have violated Regulation E because the regulation requires LGE to use an opt-in form that is "substantially similar" to the model form.  *See* 12 C.F.R. § 205.17(d) ("The notice required by paragraph (b)(1)(i) of this section shall be substantially similar to Model Form A–9 set forth in Appendix A of this part, include all applicable items

---

[6]     LGE's funds availability policy is heavily regulated by the Federal Reserve, which further supports that the Federal Reserve always understood the model language to include only money that was available to use. *See* 12 C.F.R. § 229.10.

[7]     Indeed, LGE did not even have to provide or use Plaintiff's ledger or actual balance *at all*.  *See* 12 C.F.R. § Pt. 707(c)(1), App. C (Official Staff Interpretation of 12 C.F.R. § 707.11(c)) (credit unions may provide members with their available account balances *only*, excluding "funds that are deposited in the member's account, such as from a check, that are not yet made available for withdrawal."). Credit unions are not required to "disclose . . . additional amounts [that] are not available for all transactions" 12 C.F.R. § 707.11(c).  Accordingly, there can be no claim for not using the "ledger" or "actual" balance.

in this paragraph, and may not contain any information not specified in or otherwise permitted by this paragraph."). In fact, the regulation only permits certain alterations of the model form's language. 12 C.F.R. § 205.17(d)(6) ("the institution may modify the content…"). The permitted modifications do not include any modifications to the "enough money language."[8]

Thus, LGE used the exact language for its opt-in form the Federal Reserve expected to be used for overdraft programs using the available balance. (*Supra* at p. 17.) If, contrary to the Federal Reserve's judgment and testing, Plaintiff truly believes the "enough money" language is deceptive or inaccurate, she should focus her efforts on petitioning the Federal Reserve (or now the Consumer Protection Financial Bureau) instead of trying to sue a financial institution for following exactly the regulation she claims was violated.

**C.    Plaintiff's Claims For Unjust Enrichment And Money Had And Received Should be Dismissed.**

---

[8]    "(6) Permitted modifications and additional content. If applicable, the institution may modify the content required by § 205.17(d) to indicate that the consumer has the right to opt into, or opt out of, the payment of overdrafts under the institution's overdraft service for other types of transactions, such as checks, ACH transactions, or automatic bill payments; to provide a means for the consumer to exercise this choice; and to disclose the associated returned item fee and that additional merchant fees may apply. The institution may also disclose the consumer's right to revoke consent. For notices provided to consumers who have opened accounts prior to July 1, 2010, the financial institution may describe the institution's overdraft service with respect to ATM and one-time debit card transactions with a statement such as "After August 15, 2010, we will not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below)."

Plaintiff's claim for unjust enrichment fails because "[u]nder Georgia law, the theory of unjust enrichment applies [only] when there is no legal contract . . . ." *Clark v. Aaron's, Inc.*, 914 F. Supp. 2d 1301, 1309 (N.D. Ga. 2012) (internal quotations omitted). *See also Cappuccitti v. DirecTV, Inc.*, 623 F.3d 1118, 1127 (11th Cir. 2010) ("Unjust enrichment applies when as a matter of fact there is no legal contract, but when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for.") (quoting *Engram v. Engram*, 265 Ga. 804, 463 S.E.2d 12, 15 (1995)). Here, the conduct at issue in the Complaint is governed by the Membership Agreement, which Plaintiff attached to her pleading. Accordingly, Plaintiff's unjust enrichment claim fails.

Plaintiff's third claim for money had and received should be dismissed because it is rooted in the same restitution principles as Plaintiff's unjust enrichment claim and cannot stand for the reasons articulated above. *See Goldstein v. Home Depot U.S.A., Inc.*, 609 F. Supp. 2d 1340, 1347-48 (N.D. Ga. 2009) (holding that a party may only plead equitable claims of unjust enrichment or money had and received in the alternative where one or more of the parties contests the existence of an express contract governing the subject of the dispute.).

## IV.   CONCLUSION

Plaintiff cannot plead any facts sufficient to show that LGE is liable for any of the five claims alleged in her FAC. Thus, LGE respectfully requests dismissal of the entire FAC without leave to amend.

Respectfully submitted this 11th day of May, 2016.

> **MACEY, WILENSKY, & HENNINGS, LLC**
>
> /s/ Hal J. Leitman
> Hal J. Leitman (Bar No. 446246 )
> 303 Peachtree Street, NE
> Suntrust Plaza, Suite 4420
> Atlanta, Georgia 30308
> Telephone:  404.584.1200
> Fax:  404.681.4355
> Email:  hleitman@maceywilensky.com
>
> **KATTEN MUCHIN ROSENMAN LLP**
>
> /s/ Stuart M. Ricther
> Stuart M. Richter (pro hac vice pending)
> Andrew J. Demko (pro hac vice pending)
> 2029 Century Park East, Suite 2600
> Los Angeles, CA  90067-3012
> Telephone:  310.788.4400
> Fax:  310.788.4471
> Email:  stuart.richter@kattenlaw.com
>           andrew.demko@kattenlaw.com
>
> Attorneys for Defendant LGE Community Credit Union

## <u>CERTIFICATION</u>

I HEREBY CERTIFY: (a) that the foregoing was prepared using Times New Roman 14 point font and is otherwise in full compliance with L.R. 5.1, N.D. Ga., and (b) that it was this day filed using the Court's CM/ECF system, which automatically served a copy of the within and foregoing pleading on the following CM/ECF participants:

E. Adam Webb, Esq.
G. Franklin Lemond, Jr., Esq.
Webb, Klase & Lemond, LLC

Richard D. McCune, Esq.
McCune and Wright, LLP

Taras Kihiczak, Esq.
The Kick Law Firm, APC

This 11th day of May, 2016.

**MACEY, WILENSKY, & HENNINGS, LLC**

/s/ Hal J. Leitman_____
Hal J. Leitman (Bar No. 446246)
Attorney for Defendant LGE Community Credit Union

04030915-     25