IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CAROL TIMS
individually, and on behalf of all
others similarly situated,

   Plaintiff,

     v.

LGE COMMUNITY CREDIT
UNION,

   Defendant.

CIVIL ACTION FILE
NO. 1:15-CV-4279-TWT

**OPINION AND ORDER**

This is a breach of contract action. It is before the Court on the Defendant LGE Community Credit Union's Motion to Dismiss [Doc. 30]. For the reasons stated below, the Defendant's Motion to Dismiss [Doc. 30] is GRANTED.

**I. Background**

The Plaintiff Carol Tims alleges that LGE misled her about its overdraft fee policy. In particular, Tims argues that LGE used an incorrect method of calculating her balance, leading LGE to charge her excess overdraft fees. Overdraft fees, in which a bank or other financial institution imposes a fee in exchange for honoring a

customer's transaction despite insufficient funds in the customer's account, have attracted the attention of the media and regulators alike in recent years.[1]

In 2009, the Federal Reserve adopted Regulation E, a set of rules intended to "assist consumers in understanding how overdraft services provided by their institutions operate and to ensure that consumers have the opportunity to limit the overdraft costs associated with ATM and one-time debit card transactions where such services do not meet their needs."[2] Regulation E "require[s] financial institutions to secure a customer's 'affirmative consent' before charging overdraft fees," which must be obtained through an opt-in notice.[3] This opt-in notice must contain a "brief description of the financial institution's overdraft service" and be "substantially similar" to the Fed's Model Form A-9.[4]

Though the opt-in notices have helped to raise consumer awareness of the existence of overdraft fees, they have not necessarily helped educate customers on the mechanics of overdraft protection. Many institutions, for example, have been less than

---

[1] For a more detailed account of overdraft fees and their history, regulatory and otherwise, *see generally Chambers v. NASA Federal Credit Union*, 222 F. Supp. 3d 1 (D.D.C. 2016).

[2] Electronic Fund Transfers, 74 Fed. Reg. 59,033-01 (Nov. 17, 2009) (codified at 12 C.F.R. § 205.1).

[3] *Chambers*, 222 F. Supp. 3d at 5.

[4] 12 C.F.R. § 1005.17(d).

clear about which balance calculation method they use to determine when an overdraft occurs. The two basic methods are known as the ledger (or actual) balance method, and the available balance method. The ledger balance method "factors in only settled transactions in calculating an account's balance."[5] The available balance method, on the other hand, "calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared."[6] Using the available balance method often leads to more frequent overdrafts because there is less money available in the account due to holds and pending transactions. As a result, many lawsuits have been filed alleging that consumers were misled about which method particular institutions were using, including this one.

On two separate occasions in 2013, Tims alleges that she was improperly charged overdraft fees of $30.00 after LGE determined she had insufficient funds to cover transactions she had made.[7] According to Tims, LGE promised in both its standard Membership and Account Agreement and its Regulation E Opt-In Agreement

---

[5] Consumer Financial Protection Bureau, Supervisory Highlights 8 (Winter 2015).

[6] *Id. See also* Pl.'s First Am. Compl. ¶ 21 (adopting those definitions).

[7] *Id.* at ¶ 26.

to use the ledger balance method in determining when to impose overdraft fees.[8] Had LGE done as promised, Tims claims she would have had enough money in her account to cover the transactions.[9] Instead, LGE used the available balance method, leading to the overdrafts. Tims alleges that by doing so, LGE breached both its Account Agreement and the Opt-In Agreement, as well as the implied covenant of good faith and fair dealing. Tims also alleges that LGE has been unjustly enriched and that it failed to comply with Regulation E.

In addition to these claims, Tims also seeks to represent two classes of LGE customers. The first class, called the "Positive Balance Class," would include any LGE customers who were charged overdraft fees in the past six years when their ledger balances were sufficient to cover their transactions.[10] The second, the "Regulation E Class," would include those customers who were charged overdraft fees after consenting to participate in LGE's overdraft protection program through the Opt-In Agreement.[11] LGE now moves to dismiss for failure to state a claim, arguing

---

[8] *Id.*

[9] *Id.*

[10] *Id.* at ¶ 31.

[11] *Id.*

that the Account and Opt-In Agreements unambiguously state that LGE would use the available balance method in assessing overdraft fees.

## II. Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief.[12] A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely."[13] In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff.[14] Generally, notice pleading is all that is required for a valid

---

[12] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); Fed. R. Civ. P. 12(b)(6).

[13] *Bell Atlantic v. Twombly*, 550 U.S. 544, 556 (2007).

[14] *See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983); *see also Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination").

complaint.[15] Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.[16]

### III. Discussion

**A. Breach of Contract**

Tims' first two counts allege that LGE breached both the Account Agreement and the Opt-In Agreement by imposing overdraft fees based upon her available balance instead of her actual balance. The Account Agreement states that LGE will assess overdraft fees if there are not "*sufficient* funds in [Tims'] account to pay it..."[17] The Opt-In Agreement, on the other hand, states that an "overdraft occurs when [Tims] does not have *enough* money in [her] account to cover a transaction, but [LGE] pay[s] it anyway."[18] The entirety of Tims' breach of contract claim, therefore, comes down to the interpretation of the words "sufficient" and "enough."

---

[15] *See Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985), *cert. denied*, 474 U.S. 1082 (1986).

[16] *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555).

[17] Membership and Account Agreement, Compl., Ex. 1 at 2 [Doc. 1-1] (emphasis added).

[18] Consent Form for Overdraft Services, Compl., Ex. 2 at 1 [Doc. 1-2] (emphasis added).

Contract interpretation in Georgia is a three step process.[19] First, the Court must determine if the contract language is "clear and unambiguous," in which case the Court "simply enforces the contract according to its clear terms."[20] A contract is clear and unambiguous when the contract "is capable of only one reasonable interpretation."[21] If the contract is ambiguous, however, the Court proceeds to step two, and attempts "to resolve the ambiguity by applying the rules of contract construction."[22] If ambiguity still persists after step two, then the parties' intent becomes a question for the jury.[23]

Before interpreting the agreements, the Court must first determine whether they should be interpreted together or separately. It is clear that both the Account Agreement and the Opt-In Agreement are individual contracts, each of which separately imposes contractual duties on both of the parties.[24] This means that the

---

[19] *Global Ship Systems, LLC v. Continental Cas. Co.*, 292 Ga. App. 214, 215 (2008).

[20] *Id.*

[21] *In re Estate of Boyd*, 340 Ga. App. 744, 747 (2017).

[22] *Global Ship Systems*, 292 Ga. App. at 215.

[23] *Id.* at 216.

[24] *See Pinkston-Poling v. Advia Credit Union (Advia I)*, 227 F. Supp. 3d 848, 856 (W.D. Mich. 2016).

parties could breach one contract but not the other. However, "in the context of interpreting agreements," Georgia law holds that "where multiple documents are executed at the same time in the course of a single transaction, they should be construed together."[25] There is no dispute that Tims entered into the Opt-In Agreement at the same time that she signed the Account Agreement, all in the course of opening an account at LGE.[26] The agreements should therefore be interpreted as one document.

"When interpreting a contract, the language must be afforded its literal meaning and plain ordinary words given their usual significance," as defined by dictionaries.[27] Black's defines *sufficient* as "adequate; of such quality, number, force, or value as is necessary for a given purpose."[28] *Enough* is defined by Webster's as "occurring in such quantity, quality, or scope as to fully meet demands, needs, or expectations," or alternatively as, "a sufficient number, quantity, or amount."[29] Both are effectively synonyms for one another. While the contracts make the "need" or "given purpose"

---

[25] *Curry v. State*, 309 Ga. App. 338, 341 (2011) (quoting *Martinez v. DaVita, Inc.*, 266 Ga. App. 723, 727 (2004)).

[26] Compl. ¶ 26.

[27] *Grange Mutual Casualty Company v. Woodard*, 861 F.3d 1224, 1231 (11th Cir. 2017) (citations and quotations omitted).

[28] *Sufficient*, Black's Law Dictionary (10th ed. 2014).

[29] *Enough*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993).

for the funds clear – satisfying Tims' transactions – they do not clearly articulate what is actually "adequate" to "fully meet" that purpose. Is the money that is actually in the account at the exact time of the transaction enough, or must a consumer take into account their other transactions too? Put simply, because the plain text of the contracts does not answer that question, the contracts are ambiguous as to which balance method LGE uses.

Both parties attempt to argue that the language clearly favors their side. LGE asserts that sufficient funds must entail the available balance method because, after all, "if funds are not available to use, how could they possibly meet the needs of a particular transaction?"[30] LGE points to language throughout the Account Agreement describing when funds become available to account holders, but that does not *necessarily* mean that LGE will assign overdraft fees based on that method. The Opt-In Agreement, meanwhile, is even less helpful.

On the other side, Tims argues that because "the term 'funds' [in the Account Agreement] is modified only by the terms 'sufficient' and 'insufficient' [while] 'Account' is not modified at all," that must mean that "an overdraft fee will not be charged if there are enough funds in the entirety of the account..."[31] This argument

---

[30] Def.'s Mot. to Dismiss, at 11 [Doc. 30-1].

[31] Pl.'s Resp. to Def.'s Mot. to Dismiss, at 6 [Doc. 31].

makes little sense. An account is worth nothing without the funds contained within it. Modifying the funds necessarily modifies the account. Whether "funds" or "account" is modified by "sufficient" therefore gets us no closer to saying that the contract language on its face is "clear and unambiguous."

Despite the fact that the contract language is facially ambiguous, however, the Georgia rules of contract interpretation favor the Defendant. The "cardinal rule of contract construction is to ascertain the intention of the parties."[32] All of the other canons of construction must ultimately serve this overarching purpose. To do so, Georgia's rules of contract construction require courts to "interpret any isolated clauses and provisions of the contract in the context of the agreement as a whole."[33] "Thus, the favored construction will be that which gives meaning and effect to all the terms of the contract over that which nullifies and renders meaningless a part of the document."[34]

With that in mind, it becomes clear that the parties intended "sufficient" and "enough" to mean the available balance method. In the paragraph titled "Payment Order of Your Transactions," the same section that contains the clause authorizing

---

[32] *OTS, Inc. v. Weinstock & Scavo, P.C.*, 339 Ga. App. 511, 518 (2016).

[33] *Willesen v. Ernest Communications*, 323 Ga. App. 457, 460 (2013). *See also* O.C.G.A. § 13-2-2.

[34] *Schafer Properties v. Tara State Bank*, 220 Ga. App. 378, 381 (1996).

LGE to impose overdraft fees for insufficient funds, the Account Agreement uses the term "available."[35] Just one sentence before the authorizing clause, the Account Agreement states that LGE's "payment policy may cause your larger, and perhaps more important, items to not be paid first...but may reduce the amount of overdraft or NSF fees you have to pay *if funds are not available* to pay all of the items."[36] By including the term "available" in such close proximity to the term "sufficient," the parties indicate that they view both terms to be related.

Furthermore, the Account Agreement contains an entire section titled "Funds Availability Disclosure," the first line of which says that "[t]his disclosure describes your ability to withdraw funds at LGE Community Credit Union."[37] This section "makes clear that not every dollar in a customer's account is immediately 'available' for withdrawal."[38] For example, some funds become available on the same business day that they are deposited, such as cash deposits or checks from the U.S. Treasury.[39] Others, however, "may not be available until the second business day after the day of

---

[35] Membership and Account Agreement, Compl., Ex. 1 at 2 [Doc. 1-1].

[36] *Id.* (emphasis added).

[37] *Id.* at 7.

[38] *Chambers*, 222 F. Supp. 3d at 11.

[39] Membership and Account Agreement, Compl., Ex. 1 at 7 [Doc. 1-1].

your deposit," such as check deposits totaling over $5,000 in one day.[40] "When the account agreement refers to 'available' funds, it must be referring to a subset of funds unencumbered by such restrictions – exactly the type of restrictions that can create a divergence between the [ledger] and available balances in the first place."[41]

To accept the Plaintiff's interpretation would place these two sections of the Account Agreement in conflict. LGE's funds availability policy would mean nothing if it had no actual effect on a customer's ability to withdraw funds. Tims argues that this should nevertheless be construed against LGE, because it was the drafter of the agreements. But as LGE points out, that particular rule of contract interpretation is one of last resort, only to be used "[i]f the construction is doubtful."[42] Here, it is not. As stated before, "[t]he construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part."[43] It is clear that the most harmonious and natural reading of

---

[40]   *Id.*

[41]   *Chambers*, 222 F. Supp. 3d at 11.

[42]   O.C.G.A. § 13-2-2.

[43]   *Id.*

the Account Agreement, when considering all of its sections in context, leads to the use of the available balance method, not the ledger balance method.[44]

Tims relies heavily on cases addressing overdraft fee litigation in other courts to show that the language is in fact ambiguous. But these cases are all distinguishable despite initially appearing similar to this case. A number of the cases Tims cites allowed plaintiffs to get past motions to dismiss because the contracts either did not elaborate on the term "available," or never used it in the first place. For example, in *Gunter v. United Federal Credit Union (Gunter I)*, No. 3:15-CV-00483-MMD-WGC, 2016 WL 3457009 at *1 (D. Nev. June 22, 2016), the court found that the credit union reserved "the right to determine the amount of available funds in [a customer's] account," but the account agreement did not seem to have a description of what "available funds" meant.[45] And in *Advia I*, the account agreement never used the term

---

[44] The same is true for the Opt-In Agreement. Reading both agreements together, it is clear that "enough" is being used as a synonym for "sufficient." The "Payment Order of Your Transactions" section states that LGE's payment order policy "is important if there is not *enough* money in your account to pay all of the items that are presented." Membership and Account Agreement, Compl., Ex. 1 at 7 [Doc. 1-1] (emphasis added). The next line contains the word "available," and the line after that authorizes LGE to impose overdraft fees if "an item is presented without *sufficient* funds." *Id.* (emphasis added).

[45] *Gunter I*, 2016 WL 3457009 at *3. *See also Wodja v. Washington State Employees Credit Union*, 2016 WL 3218832 at *3 (W.D. Wash. June 9, 2016) (finding ambiguity in part because the agreement never defined what "available funds" are).

"available" at all.[46] Other cases involved agreements that used "available" repeatedly, but when the courts found ambiguity, they never sought to resolve it through the use of the canons of construction.[47]

None of these cases persuade the Court that the Plaintiff's interpretation is anything more than her own idiosyncratic reading of the agreements. Although the Plaintiff's interpretation may be persuasive or reasonable when certain clauses are viewed in isolation, they lead to conflict and absurdity when viewing the agreements as a whole. The only reasonable interpretation of the agreements requires the use of the available balance method. Consequently, the Plaintiff's breach of contract claims must be dismissed.

**B. Remaining Equitable Claims**

Tims also brings equitable claims of breach of the implied covenant of good faith and fair dealing, unjust enrichment and money had and received against LGE. The latter two claims can be quickly dismissed because neither applies where there is

---

[46] *See Advia I*, 227 F. Supp. 3d at 855 ("...Advia fails to point to any similar provisions in the Member Account Agreement suggesting that the available balance determines the overdraft status of an account.").

[47] *See, e.g.*, *In re TD Bank, N.A. Debit Card Overdraft Fee Litigation*, 150 F. Supp. 3d 593, 621-624 (D.S.C. 2015) (finding ambiguity despite using "sufficient" and "available" together because the agreement also used the seemingly contradictory term "negative balance," but doing so without attempting to use the canons of construction to resolve the apparent contradiction).

a written contract.[48] The good faith claim can also be dismissed because the Plaintiff has failed to show that the agreements required the use of the ledger balance method.

Claims for breach of good faith are not independently actionable absent a breach of a specific contract term.[49] Rather, the implied covenant "is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those terms *de facto* when performance is maintained *de jure*."[50] Breaches of this implied covenant often occur when a contract gives one party discretion and they are accused of abusing that discretion.[51] But while LGE had discretion in this case to decide whether or not to impose overdraft fees, the Court has already interpreted the language of the contract as empowering LGE to make those determinations based upon the available balance method. As "there can be no breach of an implied covenant of good

---

[48] *See Smith Serv. Oil Co. v. Parker*, 250 Ga. App. 270, 271 (2001) ("The theory of unjust enrichment applies when there is no legal contract..."). Money had and received is fundamentally based upon the same principle – that one should not be unjustly enriched at the expense of another – and is likewise limited to situations where the parties dispute the existence of a written contract. *See Baghdady v. Cent. Life Ins. Co.*, 224 Ga. App. 170, 171 (1996) (holding that money had and received "applies only when there is no actual legal contract.").

[49] *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1429 (11th Cir. 1990).

[50] *Id.*

[51] *See, e.g.*, *Brazeal v. NewPoint Media Group, LLC*, 340 Ga. App. 689, 692 (2017) (citations omitted) (addressing the implied covenant in the context of a bank empowered to pursue various remedies in the event of a default).

faith where a party to a contract has done what the provisions of the contract expressly give him the right to do," this claim is also dismissed.[52]

**C. Violation of the Electronic Fund Transfer Act**

Tims claims that LGE violated the Electronic Fund Transfer Act[53] because it misrepresented its overdraft program in the Opt-In Agreement, thereby never securing her affirmative consent to participate.[54] EFTA, as implemented by Regulation E, requires financial institutions like LGE to both inform customers about their overdraft programs and to obtain their affirmative consent before enrolling them.[55] Specifically, Regulation E requires LGE to provide a notice "substantially similar to Model Form A-9," that contains, among other things, a "brief description of the financial institution's overdraft service."[56] LGE's Opt-In Notice simply copied the model form *in toto*.

Tims effectively argues that LGE's Opt-In Agreement failed to comply with these requirements in one of two ways. First, she argues that the language of the Opt-

---

[52] *Nine Twenty, LLC v. Bank of the Ozarks*, 337 Ga. App. 180, 183 (2016) (*citing Martin v. Hamilton State Bank*, 314 Ga. App. 334, 335 (2012)).

[53] 15 U.S.C. § 1693 *et seq.*

[54] First Am. Compl. ¶¶ 65-69.

[55] 12 C.F.R. §§ 205.17, 1005.17.

[56] *Id.* at § 1005.17(d).

In Agreement – that "[a]n overdraft occurs when you do not have *enough* money in your account to cover a transaction" – means the ledger balance method.[57] If this were the case, LGE would violate Regulation E because the Opt-In Agreement *misrepresents* LGE's *actual* practice, which is to use the available balance method, thereby vitiating Tims' consent.

In support, Tims leans on both the plain language of the Opt-In Agreement and publications from the Consumer Financial Protection Bureau. But none of these definitively show that the Opt-In Agreement requires the ledger balance method. The plain language gets the Plaintiff only as far as ambiguity; it does not win the day for her. The Opt-In Agreement never defines what constitutes "enough" money. "Enough money" can mean either the available or ledger balance method. And the first publication Tims cites, the CFPB's "Official Interpretations" of Regulation E, merely illustrates a situation in which a bank could not assess an overdraft fee because it never provided an opt-in notice.[58] While this example might imply the use of the ledger balance method in *that* situation, it does not foreclose other possible situations employing the available balance method.

---

[57] Consent Form for Overdraft Services, Compl., Ex. 2 at 1 [Doc. 1-2] (emphasis added).

[58] Official Interpretation of "17(b) Opt-In Requirement," § 1.iv., 12 C.F.R. § Pt. 1005, Supp. I.

The second publication – the CFPB's Winter 2015 "Supervisory Highlights" – is even less helpful than the first because it is completely irrelevant. That publication took financial institutions to task for switching balance calculation methods without informing their consumers.[59] The Plaintiff argues that because those institutions were presumably using Model Form A-9, and had switched from the ledger balance method to the available balance method, the fact that the CFPB requires a new disclosure must mean that Model Form A-9 describes the ledger balance method. But there are a number of problems with the Plaintiff's argument. First, the publication says nothing about which form the institutions were using. While the Plaintiff presumes it was the model form, it could just as easily have been their own version of that form. Second, even if they were using the model form, the primary issue the CFPB was addressing was the switch in methods without additional notification, not the sufficiency of the original disclosure. Institutions could just as easily have been switching in the opposite direction and created the same problem.

At most, these publications from the CFPB, along with the plain language of the agreement, mean that "enough money" could mean either balance calculation method. Because "enough money" can mean the available balance method, LGE

---

[59] Consumer Financial Protection Bureau, Supervisory Highlights 8 (Winter 2015).

cannot be said to have explicitly misled the Plaintiff or inaccurately described its overdraft program. The only thing LGE can be said to be guilty of is a lack of precision.

This lack of precision forms the basis for the Plaintiff's alternative argument that the Opt-In Agreement's balance calculation ambiguity violated Regulation E, which requires that disclosures be made in a "clear and readily understandable" way.[60] However, EFTA also provides a safe harbor provision which states that no liability shall be imposed for "any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the Bureau or the Board."[61] Other courts that have addressed this provision have focused on the statute's use of the phrase "in proper form" to distinguish between questions of form and content.[62] In those previous cases, the courts uniformly allowed claims to proceed past the

---

[60] 12 C.F.R. § 205.4.

[61] 15 U.S.C. § 1693m(d)(2).

[62] *See Gunter v. United Fed. Credit Union (Gunter II)*, No. 3:15-CV-00483-MMD-WGC, 2017 WL 4274196, at *3 (D. Nev. Sept. 25, 2017) (holding that because the plaintiff was challenging the accuracy of the Opt-In Agreement, an issue of content, her claim was not barred); *Advia I*, 227 F. Supp. 3d at 851-853 (same); *Berenson v. Nat'l Fin. Servs., LLC*, 403 F. Supp. 2d 133, 151 (D. Mass. 2005) (same). Of course, the line between form and content is not always clear and they often overlap. As a result, this interpretation may not end up being as helpful in the long run as these courts seem to have hoped. On the other hand, if these courts meant form only in the sense of a notice's layout or font choice, then that seems too narrow an interpretation given the purpose of having a model form in the first place.

motion to dismiss stage because the plaintiffs were fundamentally challenging the *accuracy* of the institutions' opt-in agreements.[63] But the issue here is not so much the Opt-In Agreement's accuracy, but its precision and clarity. "Enough money" does mean the available balance method. The fact that it *could* also mean the ledger balance method is a problem with its precision, not its accuracy. Precision is often an issue of form, not content. The same is true in this case. Thus, because LGE used the model form as its Opt-In Agreement, and accurately if imprecisely described its overdraft program, LGE can rest assured that it is securely moored in EFTA's safe harbor. The Plaintiff's EFTA claim should, therefore, be dismissed.

## IV. Conclusion

For the reasons stated above, the Defendant's Motion to Dismiss [Doc. 30] is GRANTED.

SO ORDERED, this 3 day of November, 2017.

/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge

---

[63] *See Advia I*, 227 F. Supp. 3d at 853 ("In short, because [the plaintiff] complains about the *accuracy* of the Opt-in Agreement..., i.e., its content or substance, and not the form of the notice, the safe harbor provision does not bar [the plaintiff's] EFTA claim.") (emphasis added).